**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| PATSY J. WISE, REGIS CLIFFORD, CAMILLE ANNETTE BAMBINI, SAMUEL GRAYSON BAUM, DONALD J. TRUMP FOR PRESIDENT INC., U.S. CONGRESSMAN DANIEL BISHOP, U.S. CONGRESSMAN GREGORY F. MURPHY, REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, and NORTH CAROLINA REPUBLICAN PARTY, | Civil Action No. 5:20-cv-505 |
| *Plaintiffs, vs.* | |
| THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; STELLA ANDERSON, in her official capacity as SECRETARY OF THE STATE BOARD OF ELECTIONS; JEFF CARMON III, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS, | |
| *Defendants.* | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ..................................................................................................1

BACKGROUND ....................................................................................................4

    A.  North Carolina's Election Code and the BOE's Role in Administering Elections..............4

    B.  The General Assembly Responds to the COVID-19 Pandemic ...........................................7

    C.  The Republican Committee's Voter Education and Get out the Vote Efforts....................9

    D.  The Coordinated Litigation Effort To Subvert HB 1169 and Alter North Carolina's Election Procedures..........................................................................10

    E.  The BOE's Consent Judgment with the Alliance Plaintiffs.................................................13

LEGAL STANDARD...........................................................................................15

ARGUMENT.......................................................................................................15

I.   THE BOE'S CHANGES TO NORTH CAROLINA ABSENTEE BALLOT LAWS VIOLATE THE UNITED STATES CONSTITUTION.......................................................15

    A.  The Elections and Electors Clauses in the United States Constitution Require State Legislatures to Regulate Elections...............................................................15

    B.  The BOE Has Usurped the General Assembly's Authority................................................18

    C.  The Fourteenth Amendment to the U.S. Constitution Prohibits the BOE's Actions, Which Dilute Valid Votes..................................................................23

    D.  The Deal Creates Two Absentee Voting Regimes in Violation of the Equal Protection Clause to the U.S. Constitution. ......................................................28

II.  EQUITY WEIGHS IN FAVOR OF A TEMPORARY RESTRAINING ORDER ...............29

CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advance North Carolina. v. North Carolina*,
　　No. 20-CVS-2965 (Sup. Ct. Wake Cnty. Mar. 4, 2020)..........................................................12

*Anderson v. Celebrezze*,
　　460 U.S. 780 (1983).................................................................................................................15

*Burdick v. Takushi*,
　　504 U.S. 428 (1992).................................................................................................................27

*Bush v. Gore*,
　　531 U.S. 98 (2000)......................................................................................................24, 28, 30

*Chambers v. N.C.*,
　　Case No. 20-CVS-500124, Order (Sup. Ct. Wake Cnty. Sept. 3, 2020) ....................2, 12, 13

*Clarno v. People Not Politicians*,
　　No. 20A21, 2020 WL 4589742 (U.S. Aug. 11, 2020)............................................................17

*Common Cause R.I. v. Gorbea*,
　　20-cv-00318, 2020 WL 4365608 (D. RI July 30, 2020)...........................................................3

*Crawford v. Marion County Election Bd.*,
　　553 U.S. 181 (2008).................................................................................................................30

*Democracy North Carolina v. North Carolina State Bd. of Elections*,
　　No. 1:20-cv-457, 2020 WL 4484063 (M.D.N.C. Aug. 4, 2020) ..................................... *passim*

*Democracy Party of Georgia, et al. v. Raffensperger, et al.*,
　　19-cv-05028-WMR (D. Ga. Mar. 6, 2020)................................................................................3

*DSCC v. N.C. State Bd. of Elections*,
　　No. 20-CVS-69947 (Sup. Ct. Wake Cnty. Sept. 8, 2020) ......................................................12

*Dunn v. Blumstein*,
　　405 U.S. 330 (1972)............................................................................................................23, 28

*Frank v. Walker*,
　　574 U.S. 929 (2014).................................................................................................................17

*Griffin v. Roupas*,
　　385 F.3d 1128 (7th Cir. 2004) ..................................................................................................5

Case 5:20-cv-00505-D   Document 4   Filed 09/26/20   Page 3 of 37

*Hadley v. Junior Coll. Dist.*,
   397 U.S. 50 (1968)............................................................................28

*Harper v. Va. Bd. of Elections*,
   383 U.S. 663 (1966)..........................................................................28

*Jenkins v. State Bd. of Elections of N.C.*,
   180 N.C. 169, 104 S.E. 346 (1920)....................................................5

*LaRose v. Simon*,
   62-CV-20-3149 (Ramsey Cty. Dist. Ct. July 17, 2020).....................3

*League of Women Voters of Va. v. Va. State Bd.*,
   20-cv-00024 (W.D. Va. Aug. 21, 2020) .............................................3

*Lee v. Va. State Bd. of Elections*,
   843 F.3d 592 (4th Cir. 2016) ............................................................15

*Little v. Reclaim Idaho*,
   No. 20A18, 2020 WL 4360897 (U.S. July 30, 2020).......................17

*Merrill v. People First of Ala.*,
   No. 19A1063, 2020 WL 3604049 (U.S. July 2, 2020)................17, 29

*North Carolina Alliance for Retired Americans v. North Carolina State Board of Elections*,
   No 20-CVS-8881 (Sup. Ct. Wake Cnty.) ................................. *passim*

*North Carolina Democratic Party v. North Carolina*,
   No. 19-CVS-14688 (Sup. Ct. Wake Cnty.) .......................................12

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006)..............................................................................29

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
   140 S. Ct. 1205 (2020)......................................................................17

*Reynolds v. Sims*,
   77 U.S. 533 (1964)............................................................................23

*Stringer v. North Carolina*,
   No. 20-CVS-5615 (Sup. Ct. Wake Cnty.) ........................................12

*United States v. Classic*,
   313 U.S. 299 (1941)..........................................................................23

*Veasey v. Perry*,
   135 S.Ct. 9 (2014).............................................................................17

iii

*Voto Latino Found. v. Hobbs*,
   2:29-cv-05685 (D. Az. June 18, 2020). ................................................3

*Wilson v. Thomas*,
   No. 5:14-CV-85-BO, 2014 WL 5307491 (E.D.N.C. Oct. 16, 2014) .......................15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ....................................................................15

**Statutes**

3 U.S.C. § 7 ...............................................................................26

N.C.G.S. § 1A-1, 42 .......................................................................12

N.C.G.S. § 163 ...........................................................................1, 6

N.C.G.S. § 163-22(a) ....................................................................6, 18

N.C.G.S. § 163-22.2 .......................................................................7

N.C.G.S. § 163-27 .........................................................................7

N.C.G.S. § 163-27.1 ....................................................................1, 18

N.C.G.S. § 163-182.5(b) ..................................................................25

N.C.G.S. § 163-182.5(c) ..................................................................26

N.C.G.S. § 163-223.6(a)(5) ...............................................................22

N.C.G.S. § 163-226(a) .....................................................................5

N.C.G.S. § 163-226.3 ...................................................................6, 22

N.C.G.S. § 163-226.3(a)(6) ...............................................................26

N.C.G.S. § 163-227.2(b) ...................................................................6

N.C.G.S. § 163-227.6 ......................................................................6

N.C.G.S. § 163-227.6(a) ...................................................................6

N.C.G.S. § 163-227.6(c)(2) ................................................................6

N.C.G.S. § 163-227.10(a) .................................................................28

N.C.G.S. § 163-229(b) ....................................................................22

Case 5:20-cv-00505-D   Document 4   Filed 09/26/20   Page 5 of 37

N.C.G.S. § 163-230.1(c) ...................................................................................................2

N.C.G.S. § 163-231(a) ......................................................................................................5

N.C.G.S. § 163-231(b)(1) .............................................................................................5, 20

N.C.G.S. § 163-231(b)(2) ........................................................................................19, 21, 25

N.C.G.S. § 163-231(b)(2)(b) ............................................................................................6

N.C.G.S. § 163 art. 14A ..................................................................................................6

N.C.G.S. § 163 art. 20 .....................................................................................................5

**Other Authorities**

U.S. Const. amend. I .....................................................................................................27

U.S. Const. amend. XIV ........................................................................................23, 27, 28

U.S. Const. art. I, § 4, cl. 1 ........................................................................................1, 3, 15

U.S. Const. art. II, § 1, cl. 2 ...........................................................................................16

# INTRODUCTION

Recent actions of the North Carolina Board of Elections threaten imminent and irreparable injury to the voters of this state, candidates running for election in November 2020, political parties, and all other persons invested in the political process. With over a million absentee ballots already requested for the election, and hundreds of thousands sent to voters, the Board has usurped the authority of the North Carolina General Assembly by unilaterally cutting a back room deal with Plaintiffs' political adversaries that will have the effect of eviscerating statutes guaranteeing a fair election. The harm is occurring now, and unless these actions are immediately enjoined, the harm will be irreparable.

The United States Constitution requires the North Carolina General Assembly to set the time, place, and manner for elections in the state and for choosing this state's presidential electors. *See* U.S. Const. art. I, § 4, cl. 1, art. II, § 1. Consistent with that authority, the General Assembly enacted and continues to modify a comprehensive election code. *See generally* N.C.G.S. § 163. It also created a Board of Elections ("BOE") to supervise elections with express limits on the BOE's power. Although the BOE has certain "emergency powers" and the power to make "reasonable rules and regulations," the BOE is required to avoid unnecessary conflict with the election code. N.C.G.S. §§ 163-27.1; 163-22(a).

In June 2020, the General Assembly responded to the COVID-19 pandemic by enacting HB 1169, which adapts the requirements and procedures for voting in the November 2020 election to the current circumstances. HB 1169 temporarily relaxes certain voting restrictions and appropriates additional funding so that the election may be conducted in a safe, efficient, and fair manner. The General Assembly considered many proposals before finalizing the bill, including several from the BOE. No side got everything it wanted, and a bipartisan compromise was reached that carefully balanced competing interests.

1

Although several partisan groups filed lawsuits in North Carolina state and federal court challenging the legislation, the two courts that have already addressed the issues left virtually all provisions intact. *See Democracy North Carolina v. North Carolina State Bd. of Elections*, No. 1:20-cv-457, 2020 WL 4484063, at *64 (M.D.N.C. Aug. 4, 2020) (granting limited relief but denying, among other things, a request for injunctive relief against witness requirement for absentee ballots); Leland Decl., Ex. 1, *Chambers v. N.C.,* Case No. 20-CVS-500124, Order (Sup. Ct. Wake Cnty. Sept. 3, 2020) (denying request to enjoin witness requirement for absentee ballots).

Then, on September 22, with only 42 days until the November 3 general election, and ***after absentee voting had already begun***,[1] the BOE effectively rewrote important absentee voting provisions. It did so through a proposed Consent Judgment negotiated with the plaintiffs in *North Carolina Alliance for Retired Americans v. North Carolina State Board of Elections*, No 20-CVS-8881 (Sup. Ct. Wake Cnty.), and three accompanying "Numbered Memos" of instruction to North Carolina County Boards of election. *See* Leland Decl., Ex. 2, Plaintiffs' and Executive Defendants' Joint Mot. for Entry of a Consent Judgment. In particular, the BOE's modifications purport to: (1) extend the deadline for receipt of mailed-in ballots from three days after election day, as plainly specified in the statute, to nine days after election day; (2) emasculate the statutory requirement that only mailed ballots postmarked by 5:00 p.m. on election day be counted; (3) effectively eliminate the statutory requirement that one person witness an absentee ballot; and (4) neuter restrictions on who can handle and return completed ballots. Many of these changes were specifically rejected by the General Assembly in June, and they are not necessary responses to COVID-19.

---

[1] State officials began mailing out ballots on September 4. *See* N.C.G.S. § 163-230.1(c).

2

Moreover, the purported "consent judgment" appears to be part of a nation-wide strategy formulated by lawyers for the Democratic National Committee. Ironically dubbed the "Democracy Docket," the group is funded by unreported contributions. As Marc Elias, the Democratic Party's top election lawyer and founder of Democracy Docket, put it, if litigation could lead to an increase of "1 percent of the vote [for Democrats], that would be among the most successful tactics that a campaign could engage in." Leland Decl., Ex. 3, Marc Elias Tweet. The "Democracy Docket" boasts that it has sponsored 56 lawsuits in 22 states around the country by Democratic Party committees and their allies to rewrite election laws in the state and federal courts. Leland Decl., Ex. 4, Marc Elias, "Committed to Justice," On the Docket Newsletter (Sept. 2020). But rather than litigating those cases to conclusions—because they might and most often do lose on their challenges, as they have in North Carolina—their emerging strategy is to cut backroom deals with friendly state election officials to eliminate statutory protections against fraud, sow confusion among the electorate and election officials, and extend the November 2020 election into mid-November or beyond. Already, this strategy has played out in purported "consent decrees" entered with complicit election officials in Rhode Island,[2] Virginia[3], Minnesota,[4] Arizona,[5] and Georgia.[6] This is an effort to take responsibility for election laws from the state legislatures, where it is vested by Article I, section 4 of the Constitution, and place it in the courts.

A temporary restraining order is required. The BOE's "Numbered Memos" that are an integral part of the backroom deal purport to be effective immediately, and with 1,028,648 requests

---

[2] *Common Cause R.I. v. Gorbea*, 20-cv-00318, 2020 WL 4365608 (D. RI July 30, 2020).

[3] Leland Decl., Ex. 5, *League of Women Voters of Va. v. Va. State Bd.*, 20-cv-24, (W.D. Va. Aug. 21, 2020).

[4] Leland Decl., Ex. 6, *LaRose v. Simon*, 62-CV-20-3149, (Ramsey Cty. Dist. Ct. July 17, 2020).

[5] Leland Decl., Ex. 7, *Voto Latino Found. v. Hobbs*, 2:29-cv-05685 (D. Az. June 18, 2020).

[6] Leland Decl., Ex. 8, *Democracy Party of Georgia, et al. v. Raffensperger, et al.*, 19-cv-05028-WMR, Compromise Settlement Agreement, Dkt. 56-1 (D. Ga. Mar. 6, 2020).

3

for absentee ballots already submitted through September 26,[7] and hundreds of thousands of absentee ballots already sent out, voters, like the individual Plaintiffs, are—right now, today— confronted with two election regimes—one legitimately enacted by the General Assembly, and one constructed by a rogue Executive Branch Commission.

Moreover, Plaintiffs are likely to succeed on the merits of their claims and will suffer irreparable harm if relief is not granted. The Republican Committees have expended considerable resources to get out the vote for their preferred candidates in North Carolina and to educate voters about North Carolina's election laws. They have already contacted, through door knocking, telephone calls, or mailings, more than 7.6 million households in North Carolina with pleas to vote for the Republican ticket and instructions on how to do so in accord with the legitimate election regime. These investments will be wasted if the BOE's changes remain in place. And the individual Plaintiffs either have voted or plan to vote in the upcoming election. The BOE's unilateral changes to North Carolina's voting laws—after absentee voting has already begun—will also cause widespread voter confusion. The remaining equities, which include North Carolina's interests in promoting fair and honest elections, safeguarding voter confidence in the integrity of election results, and administering orderly elections further necessitate a temporary restraining order. Against these equities, the BOE's unconstitutional and ultra vires actions carry no weight.

## **BACKGROUND**

### A.    North Carolina's Election Code and the BOE's Role in Administering Elections

Today, North Carolina offers its citizen three ways to vote: (1) absentee voting by mail-in ballot, (2) in-person early voting, and (3) in-person voting on Election Day. The General Assembly

---

[7] Current number of absentee ballot requests available at https://www.ncsbe.gov/.

4

created the option for absentee voting in 1917,[8] and more recently expanded the absentee voting option to allow "no excuse" absentee voting; now anyone can vote absentee simply by complying with the safeguards enacted by the General Assembly. The availability of these three options maximizes election participation, but each is also regulated to ensure that elections are fair, honest, and secure.

The first option is to vote by absentee ballot. *See generally* N.C.G.S. § 163 art. 20. The BOE purported to modify this method through its Consent Judgment and Numbered Memos. North Carolina allows "[a]ny qualified voter of the State [to] vote by absentee ballot in a statewide . . . general . . . election." *Id.* § 163-226(a). Given the consensus that mail-in ballots present a higher risk of fraud than ballots submitted in person,[9] North Carolina enacted measures to deter and detect fraudulent mail-in ballots. As relevant here, the voter must complete and certify the ballot-return envelope in the presence of two witnesses (or a notary), who must certify "that the voter is the registered voter submitting the marked ballot[]" (the "Witness Requirement"). *Id.* § 163-231(a). The voter (or a near relative or verifiable legal guardian) can then deliver the ballot in person to the county board office or transmit the ballot "by mail or by commercial courier service, at the voter's expense, or delivered in person" not "later than 5:00 p.m. on the day of the" general election. *Id.* § 163-231(b)(1). A ballot would be considered timely if it was postmarked

---

[8] *See Jenkins v. State Bd. of Elections of N.C.*, 180 N.C. 169, 104 S.E. 346, 347 (1920).

[9] For example, a commission chaired by President Jimmy Carter and former Secretary of State James A. Baker, III found that voting by mail is "the largest source of potential voter fraud." Leland Decl., Ex. 9, Carter-Baker Report, at 46. Other commissions have reached the same conclusion, finding that "when election fraud occurs, it usually arises from absentee ballots." Leland Decl., Ex. 10, Morley Redlines Article, at 2. This is true for a number of reasons. For instance, absentee ballots are sometimes "mailed to the wrong address or to large residential buildings" and "might get intercepted." Leland Decl., Ex. 9, Carter-Baker Report, at 46. Absentee voters "who vote at home, at nursing homes, at the workplace, or in church are more susceptible to pressure, overt and subtle, or to intimidation." *Id*. And "[v]ote buying schemes are far more difficult to detect when citizens vote by mail." *Id*. As one court put it, "absentee voting is to voting in person as a take-home exam is to a proctored one." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).

5

by election day (the "Postmark Requirement") and received "by the county board of elections not later than three days after the election by 5:00 p.m." (the "Receipt Deadline"). *Id.* § 163-231(b)(2)(b). With limited exceptions, North Carolina law prohibits anyone except the voter's near relative or legal guardian from assisting a voter with the completion and submission of an absentee ballot (the "Assistance Ban" and "Ballot Delivery Ban"). *Id.* § 163-226.3.

The second option for North Carolina voters is one-stop early voting. *See id.* § 163-227.6. Under this provision, county boards can establish one or more early-voting locations, which the BOE must approve. *Id.* § 163-227.6(a). Those locations open on the third Thursday before Election Day, and early voting must be conducted through the last Saturday before the election. *Id.* § 163-227.2(b). North Carolina law mandates the hours at which the early voting sites must open, and requires that if "any one-stop site across [a] county is opened on any day . . . all one-stop sites shall be open on that day" ("Uniform Hours Requirement"). *Id.* § 163-227.6(c)(2).

The third option is in-person voting on election day. *See generally* § 163 art. 14A. As with the other two methods of voting, the General Assembly has prescribed a series of rules, to be administered by the BOE and county boards, to ensure that in-person voting is fair, efficient, and secure. *See id.*

The General Assembly created the BOE and empowered it with "general supervision" of elections and the authority "to make such reasonable rules and regulations" for elections. *Id.* § 163-22(a). The BOE's rules cannot "conflict with any provisions of" North Carolina's election code. *Id.* That is true even where exigent circumstances require the BOE to pass temporary rules or exercise emergency powers. The BOE can promulgate temporary rules should any provision of North Carolina's election code be held unconstitutional, provided that those rules "do not conflict with any provisions of . . . Chapter 163 of the General Statutes and such rules and

6

regulations shall become null and void 60 days after the convening of the next regular session of the General Assembly." *Id.* § 163-22.2. And while, "upon recommendation of the Attorney General," the BOE can "enter into agreement with the courts in lieu of protracted litigation," it can only do so "until such time as the General Assembly convenes." *Id.*

The Executive Director may also exercise "emergency powers to conduct an election in a district where the normal schedule for the election is disrupted by . . . [a] natural disaster[,] [e]xtremely inclement weather[, or certain] armed conflict[s]." N.C.G.S. § 163-27. These powers are similarly limited. The statute provides that in exercising this power, "the Executive Director ***shall*** avoid unnecessary conflict with the provisions of" the voting code. *Id.* (emphasis added). The statutory provisions concerning the BOE confirm that it cannot pass rules that conflict with North Carolina's election code.

## B. The General Assembly Responds to the COVID-19 Pandemic

The General Assembly took decisive action in response to the COVID-19 pandemic and enacted HB 1169, which passed into law on June 12, 2020. The bill modified voting laws for the 2020 election and appropriated funding to ensure the election may be conducted in a safe, efficient, and fair manner.

Before enacting HB 1169, the Assembly spent a month and a half working on the bill[10] and considered many proposals. The BOE advanced several, including a proposal to reduce or eliminate the witness requirement for absentee ballots. Leland Decl., Ex. 12, State Bd. Mar. 26, 2020 Ltr. at 3. Moreover, the General Assembly had the benefit of information about other primary elections conducted during the pandemic, as well as reports of challenges faced by the United States Postal Service ("USPS"). The General Assembly was also familiar with the recent election

---

[10] Leland Decl., Ex. 11, Jordan Wilkie, *NC House Passes Bipartisan Election Bill To Fund COVID-19 Response*, Carolina Public Press (May 29, 2020), at 3.

7

in North Carolina's Ninth Congressional District, which was tainted by "absentee ballot fraud" and needed to be held anew, and from that incident understood the importance of restricting who can assist voters with the request for, filling out, and delivery of absentee ballots. *See* Leland Decl., Ex. 13, *In The Matter Of: Investigation of Election Irregularities Affecting Counties Within the 9th Cong. Dist.*, Order at 2 (Mar. 13, 2019).

HB 1169 passed with overwhelming bipartisan majorities, by a vote of 105-14 in the House and by a vote of 37-12 in the Senate,[11] and was signed by Governor Cooper. Members lauded the bill: As Democrat representative Allison Dahle remarked, "[n]either party got everything they wanted," but the "compromise bill" was "better for the people of North Carolina."[12] For the November 2020 election, among other things, the General Assembly:

- Reduced the number of witnesses required for absentee ballots to one person instead of two, HB 1169 § 1.(a).

- Allowed voters to call the State or county board of elections to request a blank absentee ballot request form be sent to the voter via mail, e-mail, or fax. *Id* § 5(a).

- Enabled voters to request absentee ballots online. *Id.* § 7.(a).

- Allowed completed requests for absentee ballots to be returned in person or by mail, e-mail, or fax. *Id.* § 2.(a).

- Permitted "multipartisan team" members to help any voter complete and return absentee ballot request forms. *Id.* § 1.(c).

- Provided for a "bar code or other unique identifier" to track absentee ballots. *Id.* § 3.(a)(9).

- Appropriated funds "to prevent, prepare for, and respond to the coronavirus pandemic during the 2020 federal election cycle." *Id*. § 11.1.(a).

---

[11] Leland Decl., Ex. 14, HB 1169, Voting Record.

[12] *See* Leland Decl., Ex. 11, Jordan Wilkie, *NC House Passes Bipartisan Election Bill To Fund COVID-19 Response*, Carolina Public Press (May 29, 2020).

These changes balanced the public health concerns of the pandemic against the legitimate needs for election security. To balance the public health concerns against the interests in election security and orderly administration, the General Assembly retained several provisions, including (1) the Postmark Requirement, (2) the three-day Receipt Deadline, (3) the Assistance Ban and Ballot Delivery Ban, and (4) a reduced one-person Witness Requirement.

### C. The Republican Committee's Voter Education and Get out the Vote Efforts

Since the enactment of SB 1169, the Republican Committees have invested significant resources, time, and effort in educating voters about North Carolina's voting procedures and regulations in order to ensure that Republicans' votes are successfully counted in the November election. *See* Leland Decl., Ex. 15, Dore Decl. ¶¶ 11-13; Leland Decl., Ex. 16, White Decl. ¶¶ 7-10; Leland Decl., Ex. 17, Dollar Decl. ¶¶ 10-11; Leland Decl., Ex. 18, Clark Decl. ¶¶ 7-9. For example, the NCRP spent $250,000 in support of door-knocking efforts to educate voters, and over $2.2 million on direct mail campaigns to educate over 7.6 million North Carolina households about absentee ballot procedures. Dore Decl. ¶¶ 11, 13. The RNC also set up four Victory Headquarters Field Offices in North Carolina and has approximately 16 paid staff working on voter education in the state. White Decl. ¶ 9. The Republican Committees prioritized their strategic activities in reliance on North Carolina's established voting laws. *See* Dore Decl. ¶¶ 14-15; White Decl. ¶¶ 11-12; Dollar Decl. ¶¶ 12-13; Clark Decl. ¶ 10. The BOE's recent modifications to those voting laws will largely negate the Republican Committees' previous efforts, require them to educate voters about the voting changes, and cause the Republican Committees to suffer enormous financial loss. *See* Dore Decl. ¶¶ 14-15; White Decl. ¶¶ 11-12; Dollar Decl. ¶¶ 12-13; Clark Decl. ¶ 10.

**D.  The Coordinated Litigation Effort To Subvert HB 1169 and Alter North Carolina's Election Procedures**

The General Assembly's bipartisan action to combat the COVID-19 pandemic's impact on the November election was not enough for certain Democratic Party operatives, who saw in the COVID-19 pandemic a way to legislate through the courts. *E.g.,* Leland Decl., Ex. 19, Eric Holder: Here's How the Coronavirus Crisis Should Change U.S. Elections—For Good, TIME (Apr. 14, 2020) ("Coronavirus gives us an opportunity to revamp our electoral system . . ."). In North Carolina alone, Democratic Party committees and related organizations have filed seven lawsuits attacking various aspects of North Carolina's election code. Plaintiffs in many of these cases filed motions to preliminarily enjoin certain aspects of HB 1169 and the North Carolina election code.

The first North Carolina decision came in *Democracy North Carolina*, 2020 WL 4484063. Several organizations and individuals sued the BOE and moved for a preliminary injunction, claiming that numerous provisions of North Carolina's election code, including the Witness Requirement, Receipt Deadline, Postage Requirement, Assistance Ban, and Ballot Delivery Ban, violated federal constitutional and statutory law. *See id.* at *5–10. The President Pro Tempore of the North Carolina Senate and Speaker of the North Carolina House of Representatives ("Legislative Defendants") intervened to defend the General Assembly's election laws, and the Republican Committees appeared as *amici. See id.* *3. On August 4, after a three-day evidentiary hearing and extensive argument, the district court issued a comprehensive 188-page opinion and order. *See generally id.* The court rejected nearly all of the claims, finding that plaintiffs could not show a likelihood of success on the merits. *See id.* *1, 64. For instance, the court rejected the challenge to the Witness Requirement because even elderly, high-risk voters could fill out a ballot in a short period of time and have the witness observe the process from a safe distance, thereby significantly reducing any risk of COVID-19 transmission. *Id.* at *24–33; *see also id.* at *52

10

(finding that the Ballot Delivery Ban was related to the legitimate purpose of "combating election fraud" and would likely be upheld). Moreover, the court found that even if certain procedures did "present an unconstitutional burden under the circumstances created by the COVID-19 pandemic," it was not the court's role to "undertake a wholesale revision of North Carolina's election laws," particularly so close to an election. *See id.* at *45 (citing *Purcell v. Gonzalez*, 549 U.S. 1, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006)).

Although the district court denied nearly all of the plaintiffs' claims, it did find that they were likely to succeed on two issues. First, the court found that one plaintiff (an elderly, blind nursing home resident) was likely to succeed on a Voting Rights Act claim challenging North Carolina's limitation on who could assist him with completing his ballot. *Id.* at *55, 61. Second, the court found that plaintiffs were likely to succeed in showing that North Carolina's lack of a notification and cure procedure for deficient absentee ballots violated procedural due process. *Id.* at *55. The court accordingly enjoined the Board "from allowing county boards of elections to reject a delivered absentee ballot without notice and an opportunity to be heard until" the Board could implement a uniform cure procedure. *Id.* at *64.

The BOE responded to the court's procedural due process ruling by issuing Numbered Memo 2020-19 (Leland Decl., Ex. 20), which (1) eliminated the requirement that county boards match the signature on the ballot to the voter's signature on file and (2) defined a cure procedures for deficient absentee ballots. *Id.* §§ 1, 2. A voter's failure to sign the voter certification or signing the certification in the wrong place could be cured through an affidavit. *Id.* § 2.1. Affidavits could not cure deficiencies related to the Witness Requirement, meaning the ballot would be spoiled and a new one issued to the voter. *Id.* Collectively, these procedures will be called the "Cure Process."

11

Notwithstanding the federal court's extensive ruling, which upheld the vast majority of the challenged provisions, as well as the Board's prompt action in implementing the Cure Process, the Democratic Party and related organizations remained undeterred. They continued to press forward with five lawsuits in North Carolina state court challenging many of the same provisions upheld in *Democracy North Carolina*, including one claiming that the Cure Process violated North Carolina's Constitution because it arbitrarily distinguished between voters.[13] All of those lawsuits were filed against the BOE, and the Legislative Defendants were granted intervention in each case. In all of those lawsuits except *Chambers*, Mr. Elias and the Perkins Coie law firm represented the plaintiffs against the BOE.

The second decision to address a motion to enjoin certain aspects of HB 1169 was *Chambers,* which challenged the Witness Requirement. On September 3, a three-judge panel[14] denied Plaintiffs' motion to preliminarily enjoin the Witness Requirement. *See* Leland Decl., Ex. 1, *Chambers*, Case No. 20-CVS-500124. After briefing with evidentiary submissions and an oral hearing, the panel held that there was not a substantial likelihood the plaintiffs would prevail on the merits. *Id.* at 6. Furthermore, it held that "the equities do not weigh in [plaintiffs'] favor" because of the proximity of the election, the tremendous costs that the plaintiffs' request would impose on the State, and the confusion it would cause voters. *Id.* at 7. Specifically, the panel determined that changes requested by plaintiffs "will create delays in mailing ballots for *all* North

---

[13] *See DSCC v. N.C. State Bd. of Elections*, No. 20-CVS-69947 (Sup. Ct. Wake Cnty. Sept. 8, 2020) (challenging Cure Process); *Alliance*, No. 20-CVS-8881 (Sup. Ct. Wake Cnty. Aug. 10, 2020) (challenging the Witness Requirement, Postage Requirement, Receipt Deadline, Application Assistance Ban, Ballot Delivery Ban, and Uniform Hours requirement; *Stringer v. North Carolina*, No. 20-CVS-5615 (Sup. Ct. Wake Cty. May 4, 2020) (challenges similar to those in the *Alliance* case); *Advance North Carolina. v. North Carolina*, No. 20-CVS-2965 (Sup. Ct. Wake Cnty. Mar. 4, 2020) (limitations on who may assist with completion and delivery of absentee ballots); *North Carolina Democratic Party v. North Carolina*, No. 19-CVS-14688 (Sup. Ct. Wake Cnty. Oct. 28, 2019) (Uniform Hours requirement).

[14] Under North Carolina law, all challenges to the facial validity of North Carolina statutes must be heard by a three-judge panel in the Superior Court of Wake County. N.C.G.S. § 1A-1, 42.

Carolinians voting by absentee ballot in the 2020 general election and would likely lead to voter confusion as to the process for voting by absentee ballot." *Id.* (emphasis in original).

The Board of Elections then proceeded, pursuant to a statutory requirement, to mail absentee ballots to "more than 650,000" voters who had requested them. *See* Leland Decl., Ex. 21, *The November Election Season Has Officially Started, as North Carolina Begins Sending Out Mail Ballots*, The Washington Post (Sept. 4, 2020) (indicating that on Sept. 4, the North Carolina had already begun mailing out more than 650,000 absentee ballots to voters). As of September 26, 1,028,648 absentee ballots had been requested, and 221,588 completed ballots had been returned.[15]

Notwithstanding defeats in *Democracy North Carolina* and *Chambers*, plaintiffs in the remaining cases continued to press forward. The plaintiffs in *Alliance* filed a preliminary injunction motion on August 21, and submitted supporting papers on September 4. Opposition briefs were due on September 28, with a preliminary injunction hearing scheduled for October 2. During that time, the Legislative Defendants and State Defendants began deposing fact and expert witnesses.[16] The Republican Committees, who were awaiting a ruling on their intervention motion, also participated in those depositions.

**E.     The BOE's Consent Judgment with the *Alliance* Plaintiffs**

During the time that the Legislative Defendants and Republican Committees were engaged in depositions, the State Defendants conducted secret settlement negotiations with the *Alliance* plaintiffs. Not until one of the plaintiffs' witnesses failed to show up for her deposition did the

---

[15] *See* https://www.ncsbe.gov/ for a current number of requested ballots; Leland Decl., Ex. 22, BOE Absentee Data.

[16] The depositions were not completed. After the plaintiffs and the State Board defendants announced the deal, plaintiffs refused to allow any further witnesses to be deposed.

13

plaintiffs inform the Legislative Defendants and Republican Committees of the deal. Those negotiations resulted in the plaintiffs and BOE's agreeing to the Consent Judgment, which it submitted to the court for approval on September 22. Pursuant to the Consent Judgment, the plaintiffs agreed to drop their claims against the BOE in exchange for the BOE's implementing significant changes to North Carolina's election code for the November general election. A hearing on the joint Consent Judgment motion is scheduled for October 2. However, it appears that the BOE has deemed its new "Numbered Memos" to be immediately effective.

Under the deal, the BOE implemented changes to North Carolina's election code by revising Numbered Memo 2020-19 (which established the Cure Process) and issuing new memos to county boards. Revised Numbered Memo 2020-19 now (1) requires county boards to accept a ballot signature as long as it appears to have been made by the voter and (2) allows voters to cure a ballot that is deficient due to a lack of signature, problem with the voter's contact information, or problem with the witness's certification (for instance, the witness failed to sign the ballot) by submitting a cure affidavit. *See* Leland Decl., Ex. 23, Revised Numbered Memo 2020-19.

The Board also issued Numbered Memo 2020-22, which applies only to "remaining elections in 2020," and provides that absentee ballots are timely if "(1) received by the county board by 5:00 p.m. on Election Day; or (2) the ballot is postmarked on or before Election Day and received by nine days after the election, which is Thursday, November 12, 2020 at 5:00 p.m." Leland Decl., Ex. 24, Numbered Memo 2020-22. In addition to tripling the Receipt Deadline from the statutory requirement of three days after Election Day to nine days, the BOE eliminated the Postmark Requirement by providing that a ballot is considered "postmarked" if there is information in a tracking service showing that the ballot was "in the custody of USPS or the commercial carrier on or before Election." *Id.*

14

Finally, the Board issued Numbered Memo 2020-23, which affirms that absentee ballots cannot be left in an unmanned drop box, but then negates that restriction by stating that county boards cannot "disapprove a ballot solely because it is placed in a drop box." Leland Decl., Ex. 25, Numbered Memo 2020-23. Furthermore, the Board ignored North Carolina's strict statutory limits on who may deliver a completed absentee ballot by instructing county boards that they cannot "disapprove an absentee ballot solely because it was delivered by someone who was not authorized to possess the ballot." *Id.*

## LEGAL STANDARD

A party seeking a temporary restraining order must establish a likelihood of success on the merits, irreparable harm without relief, that the balance of equities tips in plaintiff's favor, and that an injunction is in the public interest. *Wilson v. Thomas*, No. 5:14-CV-85-BO, 2014 WL 5307491, at *1 (E.D.N.C. Oct. 16, 2014); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I. THE BOE'S CHANGES TO NORTH CAROLINA ABSENTEE BALLOT LAWS VIOLATE THE UNITED STATES CONSTITUTION

#### A. The Elections and Electors Clauses in the United States Constitution Require State Legislatures to Regulate Elections.

The Elections Clause of the United States Constitution, mandates that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." U.S. Const., art. I, § 4, cl. 1. Courts have long understood that to fulfill that obligation and to ensure that elections are "fair and honest" and conducted with "some sort of order, rather than chaos," state legislatures must enact "substantial regulation." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (*quoting Storer v. Brown*, 415 U.S. 724, 730 (1974)); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 604-05 (4th Cir. 2016) (same). Furthermore, the

Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President. U.S. Const., art. II, § 1, cl. 2.

On June 11, 2020, the General Assembly fulfilled its constitutional obligations and passed HB 1169 by a strong bipartisan vote of 105-14 in the House and 37-12 in the Senate, and the bill was signed into law the next day. *See* Leland Decl., Ex. 14, HB 1169. HB 1169 made several changes to the election laws to address potential issues from COVID-19, including addressing some of the same absentee ballot regulations the BOE seeks to modify now. *See* p. 8 above.

The question of the time, place, and manner in which to conduct the election in November implicates many sensitive public policy issues that by their nature are more properly considered, balanced, and resolved by the collective judgment of the General Assembly than by the BOE. That is exactly what the General Assembly did. The BOE's Consent Judgment and Numbered Memos do not raise new issues that the General Assembly failed to consider, and it would not matter if they did. Before HB 1169 passed, the BOE had already proposed to the General Assembly reducing or eliminating the witness requirement for absentee ballots. Leland Decl., Ex. 12, State Bd. Mar. 26, 2020 Ltr. at 3 ("Reduce or eliminate the witness requirement"). Moreover, the General Assembly had the benefit of information about primary elections conducted during the pandemic and USPS's challenges. The General Assembly was also familiar with the recent North Carolina election tainted by "absentee ballot fraud" that needed to be held anew, along with the importance of banning ballot harvesting. *See* Leland Decl., Ex. 13, *In The Matter Of: Investigation of Election Irregularities Affecting Counties Within the 9th Cong. Dist.*, Order at 2 (Mar. 13, 2019). Considering all this, the General Assembly made policy judgments about how to address each of those issues. Even though not every legislator got what he or she wanted, and even though the BOE may have recommended different solutions, HB 1169 reflects careful consideration of how

16

the pandemic will affect voting in North Carolina in 2020, was overwhelmingly adopted with a bipartisan majority, and under our Constitutional system is an appropriate resolution.[17]

Deference to state legislatures and their policy compromises is especially important this close to an election. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207, 206 L. Ed. 2d 452 (2020) (*citing Purcell*, 549 U.S. 1); *Frank v. Walker*, 574 U.S. 929, 135 S.Ct. 7, 190 L. Ed. 2d 245 (2014); *Veasey v. Perry*, 574 U. S. ——, 135 S.Ct. 9, 190 L. Ed. 2d 283 (2014)). Indeed, on several occasions this summer, the Supreme Court has stayed lower-court preliminary injunctions that would have changed voting regulations in response to the pandemic just before the election. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 207 (2020) (staying injunction of Wisconsin election requirements including deadline for state's receipt of absentee ballots and emphasizing that "lower federal courts should ordinarily not alter the election rules on the eve of an election."); *Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897 (U.S. July 30, 2020) (staying injunction extending Idaho deadline for accepting ballot-initiative signatures and permitting digital collection of signatures); *Clarno v. People Not Politicians*, No. 20A21, 2020 WL 4589742, at *1 (U.S. Aug. 11, 2020) (staying injunction against Oregon initiative signature requirement); *Merrill v. People First of Ala.*, No. 19A1063, 2020 WL 3604049, at *1 (U.S. July 2, 2020) (staying injunction against absentee ballot witness requirement and other Alabama voting regulations).

---

[17] *See* Leland Decl., Ex. 11, Jordan Wilkie, NC House Passes Bipartisan Election Bill To Fund COVID-19 Response, Carolina Public Press (May 29, 2020) ("Neither party got everything they wanted," but the "compromise bill" was "better for the people of North Carolina.").

## B. The BOE Has Usurped the General Assembly's Authority.

The BOE does not have the authority to pass rules that plainly conflict with North Carolina's election code. In the Consent Judgment, the BOE relies on its "emergency powers" as the source of its authority for the changes. Leland Decl., Ex. 2, *Alliance*, No. 20-CVS-8881, Stipulation and Consent Judgment, at *10. But this effort to invoke emergency powers is misguided. The General Assembly considered substantial evidence about the pandemic and USPS's challenges and rejected essentially the same proposals that the BOE has now purported to adopt. In short, the General Assembly has already addressed whatever "emergency" the BOE is purporting to resolve with the backroom deal.

Moreover, the BOE's emergency powers are specifically limited. In exercising its authority under those powers to conduct an election during "a natural disaster," the General Assembly has provided that "the Executive Director **shall** avoid unnecessary conflict with the provisions of" the voting code. N.C.G.S. § 163-27.1 (emphasis added). Similarly, although N.C.G.S. § 163-22(a) provides that the BOE "shall have authority to make such reasonable rules and regulations with respect to the conduct of primaries and elections as it may deem advisable," that authority is also limited by the requirement that the rules and regulations "do not conflict" with the state's voting code. *Id*.

The Consent Judgment and Numbered Memos plainly modify several material components of the time, place, and manner statutes enacted by the General Assembly for absentee mail ballots. On these issues the Board is entitled to no deference under the Constitution, and if any deference was due, no amount of deference would salvage the Board's backroom deal, which illegally adopts several changes to the law that the General Assembly expressly rejected this summer.

***Receipt deadline***. The BOE's changes to the Receipt Deadline plainly conflict with the controlling statute. The statute enacted by the General Assembly requires that absentee ballots be

delivered by 5:00 p.m. on election day, or if they are mailed by the USPS, that they are postmarked by election day and received **no later *than three days after election day*** (by Nov. 6, 2020) by 5:00 p.m. N.C.G.S. § 163-231(b)(2). Flouting this directive, Numbered Memo 2020-22, purports to extend the deadline by six days: "An absentee ballot shall be counted as timely if it is either (1) received by the county board by 5:00 p.m. on Election Day; or (2) the ballot is postmarked on or before Election Day and received by ***nine days after the election***, which is Thursday, November 12, 2020 at 5:00 p.m." Leland Decl., Ex. 24, Numbered Memo 2020-22 at 1.

Since the General Assembly explicitly and responsibly revisited the North Carolina Election Code to address concerns about COVID-19 and USPS challenges, any suggestion by the Board that this change was necessitated by those issues[18] would confirm its intent to usurp authority from the General Assembly. The Consent Order expresses concern that, due to the current mail processing rates by the USPS, completed ballots mailed on election day will not arrive in time to be counted three days later, as required by statute. *E.g.*, Leland Decl., Ex. 2, *Alliance*, No. 20-CVS-8881, Stipulation and Consent Judgment, at **7-10. However, it is wholly within each voter's control to avoid unnecessary delays before mailing a completed ballot. Indeed, voters have been instructed by USPS and the BOE, among others, to request and return ballots as early as possible within the more than 60-day window before the receipt deadline. Leland Decl., Ex.

---

[18] Plaintiffs' expert in the *Alliance* case testified that he was not aware that the Postal Service is currently experiencing any problems in North Carolina during the current absentee voting period. (Leland Decl., Ex. 26, Deposition of Kenneth R. Mayer at 80.) He also could not testify as to any instances where the Postal Service had failed to deliver an absentee ballot in North Carolina for insufficient postage, and was unaware of any North Carolinian who declined to vote because of confusion as to how much postage to affix to a ballot return envelope. *Id.* at 104-06. Mayer also acknowledged that it is the Postal Service's policy to deliver absentee ballots even if they are unstamped. *Id.* at 106. Finally, he had no reason to question statistics showing that in 2019 the Postal Service delivered an average of approximately 472 million mail pieces per delivery day, and that even if every registered voter in the United States voted by mail (about 155 million ballots), those ballots would represent only a small fraction of the total volume of mail. *Id.* at 106-07.

19

27, Plunkett Aff. at ¶ 28; *see also* N.C. Gen. Stat. § 163-227.10(a). If they wait until the last day to return their completed ballots, they may also return them in person. N.C.G.S. § 163-231(b)(1). But even if a voter does wait until the last permitted hour of election day to mail his or her ballot, USPS will be able to process mail ballots within the time parameters set by North Carolina voting statutes. First, in North Carolina, more than 95% of Presort First-Class Mail is delivered within 2 days, Plunkett Aff. at ¶ 17, and no First-Class Mail in the state has more than a three-day service standard, *id*. at ¶ 18. Second, USPS's ability to deliver mail in a timely fashion will not be impacted by an increased volume of mail ballots for several reasons. *Id*. at ¶¶ 33-35. Third, USPS has established procedures and processes for delivering election mail and has a plan for the upcoming election in North Carolina. *Id*. Thus, even for voters who irresponsibly procrastinate to request and mail their ballots, it is highly likely that USPS will deliver their ballots on time. *Id*. at ¶ 14.

*Witness requirement*. The BOE has also eviscerated the critical Witness Requirement. The General Assembly revised the voting regulations for the 2020 election to reduce the requirement that two individuals witness a voter's absentee ballot to a one-witness requirement. HB 1169 § 1.(a). The BOE's Numbered Memo 2020-19 goes further and would allow an absentee ballot for which the witness or assistant did not print his or her name or address, or sign the ballot, to be cured by a voter a certification. Leland Decl., Ex. 23, Revised Numbered Memo 2020-19 at 2. A voter who submits an absentee ballot without a witness will be sent a certification for ***the voter to sign***, and upon receipt of that certification (but no witness), BOE will count the ballot. When drafting HB 1169, the General Assembly rejected this very outcome when it rejected the BOE's proposal to eliminate the witness requirement. *See* Leland Decl., Ex. 28, State Bd. Apr. 22, 2020 Ltr. at 3; Leland Decl., Ex. 12, State Bd. Mar. 26, 2020 Ltr. at 3.

Again, it would be cynical for the Board to argue that COVID-19 necessitates eliminating or neutering this requirement. The General Assembly expressly considered—and indeed made—changes to the Witness Requirement to address the COVID-19 pandemic. The BOE's backroom deal to eliminate the requirement entirely is an *ultra vires* power grab that offends the Constitution and that the pandemic does not require. As explained (pp. 10-12 above), two courts have already sustained the witness requirement against pandemic-related challenges.

**Postmark requirement**. The BOE's modification to the postmark requirement also plainly contradicts the controlling statute. With respect to absentee ballots that are mailed by USPS and received within three days of the election, the General Statutes require that the ballots be "postmarked" on or before the election day by 5:00 p.m. N.C.G.S. § 163-231(b)(2). However, for remaining elections in 2020, which could include run-offs as well as the November 3 election, the BOE has unilaterally declared that a ballot "shall be considered postmarked by Election Day if it has a postmark affixed to it *or if there is information in BallotTrax, or another tracking service* offered by the USPS or a commercial carrier, *indicating* that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." Leland Decl., Ex. 24, Numbered Memo 2020-22 at 2 (emphasis added). This rewrites the plain meaning of the statute. A "postmark" is "[a]n official mark put by the post office on an item of mail to cancel the stamp and to indicate the place and date of sending or receipt." Postmark, Black's Law Dictionary (11th ed. 2019).[19] The General Assembly has also refused to enact similar changes. Another bill, HB 1184, included a similar proposal, among other items on the Democrats' "wish list,"[20] and was not enacted.[21] HB

---

[19] *See also* USPS processing guidelines, https://about.usps.com/handbooks/po408/ch1_003.htm.

[20] Leland Decl., Ex 11, Jordan Wilkie, *NC House Passes Bipartisan Election Bill To Fund COVID-19 Response*, Carolina Public Press (May 29, 2020).

[21] *Id*.

1184 would have similarly amended the voting statute such that "absentee ballots that are received without a postmark through the United States Postal Service mail system shall be deemed properly cast and accepted and counted up to three days after the general election." HB 1184 § 3.6. Once again, this intentionally overrides the General Assembly.

Moreover, the Board's rewrite is as porous as Swiss Cheese: What "information" is sufficient to "indicate" that a ballot was in the "custody" of the USPS on Election Day? What other "tracking services" besides BallotTrax has the Board decided to look at to deem a ballot in USPS custody. The Board doesn't say. Coupled with the extended receipt deadline, it is not difficult to see where this is going: under the BOE's regime, election officials will be debating what constitutes sufficient information to indicate that a ballot was in custody of the USPS until mid-November and beyond. Postmarks will be the 2020 version of hanging chads.

***Ballot delivery and assistance bans***. The BOE's modification to the ballot delivery ban also plainly contradicts the voting statutes. Completed mail ballots may be returned in person by the voter, the voter's near relative or verifiable legal guardian, or by mail using USPS or a commercial courier. N.C.G.S. §§ 163-229(b); 163-231(a)-(b); HB 1169 §§ 1.(a), 2.(a). It is a class I felony for any other person to take possession of an absentee ballot of another voter for deliver or return to a county board of elections. N.C.G.S. § 163-223.6(a)(5). With limited exceptions, North Carolina law also prohibits anyone except the voter's near relative or legal guardian from assisting a voter with the completion and submission of an absentee ballot. N.C.G.S. § 163-226.3. The BOE would effectively neuter these protections. Numbered Memo 2020-23 provides that "[a] county board shall not disapprove an absentee ballot solely because it was delivered by someone who was not authorized to possess the ballot" and that "a county board may not disapprove a ballot solely because it is placed in a drop box." Leland Decl., Ex. 25, Numbered Memo 2020-23 at 2-

22

3.  This is not a change necessitated by COVID-19.  Stamps are widely available, *see* Leland Decl., Ex. 27, Plunkett Aff. ¶¶ 32-34, and there is no reason voters could not mail their ballots.

One need look no further than the Dowless scheme in District 9 to see the justification for the harvesting ban and not accepting ballots tainted by harvesting.  That scheme took years to uncover and led to the invalidation of a congressional election.  The BOE's deal opens the door to similar schemes to fraudulently "harvest" ballots from vulnerable communities. The Numbered Memos do not merely enforce or interpret the law, they modify it in significant, material, and unnecessary ways.  And the BOE lacks the authority to do so.

**C.    The Fourteenth Amendment to the U.S. Constitution Prohibits the BOE's Actions, Which Dilute Valid Votes.**

Not only has the BOE usurped the General Assembly's legislative power to enact North Carolina's elections laws, but it has done so in a way that violates the fundamental right to vote guaranteed by the Fourteenth Amendment to the U.S. Constitution.  If implemented, the BOE's Numbered Memos would nullify key safeguards against absentee ballot voting fraud—including the receipt deadline, witness requirement, postmark requirement, and ballot harvesting ban.  In the process, the Numbered Memos would increase the risk of voter fraud and dilute the weight of each citizen's vote in North Carolina.  The BOE's backroom deal violates the fundamental right for each citizen's vote to be counted on an equal basis and should be invalidated.

The Fourteenth Amendment to the U.S. Constitution protects the "the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 77 U.S. 533, 554 (1964). "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted." *United States v. Classic*, 313 U.S. 299, 315 (1941).  "[T]he right to have the vote counted" means counted "at full value without dilution or discount."  *Reynolds*, 377 U.S. at 555 n.29 (citation omitted); *see also Dunn v.*

*Blumstein*, 405 U.S. 330, 336 (1972) ("[A] a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."). "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000) (citation omitted).

That is precisely what the BOE's Numbered Memos do here. As shown above, see pages 18-23, the Numbered Memos would nullify four provisions of North Carolina's voting laws: (1) the receipt deadline; (2) the witness requirement for absentee ballots; (3) the postmark requirement; and (4) the ballot harvesting ban. The nullification of each of these requirements would increase the risk of voter fraud in the upcoming general election and all but invite a repeat of the McCrae Dowless fraud that North Carolina experienced in 2018.

*Witness Requirement.* The witness requirement is an impediment to voter fraud. As the federal court noted in *Democracy North Carolina*, "the One-Witness Requirement plays a key role in preventing voter fraud and maintaining the integrity of elections." *Democracy N.C.*, 2020 WL 4484063, at *35. "[M]uch like an in-person voter is required to state their name and address upon presenting themselves at an in-person polling place; the act of identification, as witnessed by the poll worker, acts as the same deterrent from committing fraud." *Id.* Furthermore, even if a fraudster were determined to violate North Carolina's election laws, the witness requirement would act as a deterrent because it would require the fraudster to enlist a confederate who is also willing to break the law and risk prosecution. *See id.* at *34 (describing the Dowless election fraud case).

*Postmark Requirement and Receipt Deadline.* The postmark requirement and receipt deadline work in tandem to ensure that North Carolina counts only timely submitted absentee

ballots—rather than absentee ballots that are voted after election day. Far from adhering to North Carolina's statutory requirement that absentee ballots be "postmarked" on or before the election day by 5:00 p.m, *see* N.C.G.S. § 163-231(b)(2), Numbered Memo 2020-22 would permit absentee ballots to be counted so long as "there is information in BallotTrax, or another tracking service offered by the USPS or a commercial carrier, indicating that the ballot was in the custody of USPS or the commercial carrier on or before Election Day." Leland Decl., Ex. 24, Numbered Memo 2020-22 at 2. Relying on a non-governmental tracking service as a substitute for the postmark requirement would increase the risk of absentee ballots being mailed (and ultimately counted) after election day. *See* Leland Decl., Ex. 29, Ellie Kaufman, "Postmarks Come Under Scrutiny as States Prepare for Mail-In Voting," CNN (Aug. 11, 2020) ("Many states add a postmark requirement to mail-in ballots to ensure that the ballots were sent before or on Election Day, trying to prevent votes submitted after Election Day from being counted.").

Furthermore, the receipt deadline and postmark requirement are an integral part of North Carolina's ability to maintain an orderly election and timely count absentee votes before their canvas deadlines. North Carolina requires the county boards of election to complete their vote canvass by "11:00 A.M. on the tenth day after every election," with the deadline extended to a "reasonable time thereafter," in the event that election officials are unable to complete a vote count despite due diligence. N.C.G.S. § 163-182.5(b). With an enormous increase in absentee ballots expected in the 2020 election, county boards will have an ample challenge to complete their canvass in the six days between the final day for receipt of absentee ballots (three days after the election) and the canvass. Leland Decl., Ex. 30, Summa Decl. ¶ 19. Even if the canvass deadline is extended, a second deadline looms: three weeks after the general election. By that date, the BOE is required "to complete the canvass of votes cast in all ballot items within the jurisdiction of

25

the State Board of Elections and to authenticate the count in every ballot item in the county."
N.C.G.S. § 163-182.5(c). If the State is unable to meet that deadline, then the "State Board may
adjourn for not more than 10 days to secure the missing abstracts." *Id*. The ultimate deadline is
the federally-imposed deadline of December 14, when the State must certify its electors or else
lose its voice in the Electoral College. 3 U.S.C. § 7."). Changing such a tightly structured election
process risks undermining its integrity.

    ***Ballot Harvesting Ban.*** Statutes such as N.C.G.S. § 163-226.3(a)(6) provide further
deterrence for those who would interfere with validity of election results through ballot harvesting,
because they criminalize absentee ballot collection and delivery on the part of anyone who is not
a voter's near relative or verifiable legal guardian. As the BOE itself successfully argued before a
federal court just a few months ago, the ballot harvesting ban is an integral component of North
Carolina's attempt to deter voting fraud: "North Carolina's restrictions on absentee ballot
assistance . . . reduce the risk of fraud and abuse in absentee voting. . ." *Democracy North
Carolina*, No. 1:20-cv-00457-WO-JLW, State Opp. to Mot. for Preliminary Injunction, Dkt. 50,
at *22 (M.D.N.C. June 26, 2020).

    To see the importance of these requirements, the Court need look no further than the 2018
fraud perpetrated by McCrae Dowless, which involved a ballot harvesting scheme that resulted in
the invalidation of the election results in North Carolina's ninth congressional district. *Democracy
North Carolina*, 2020 WL 4484063, at *34. Dowless and his co-conspirators collected absentee
ballot request forms and absentee ballots, falsified absentee ballot witness certifications, discarded
ballots from voters suspected of supporting Dowless's disfavored candidate, and submitted forged
absentee ballots—all for the purpose of "get[ting] as many Republican votes in before election day
as possible." *See id*. The witness requirement and ballot harvesting ban proved to be impediments

that Dowless and his associates attempted to evade by staggering the timing of their submission of the ballots, limiting the number of times a witness's signature appeared on ballots, and keeping the pen colors and dates consistent with those of the absentee voter. Leland Decl., Ex. 13, BOE Order (Mar. 13, 2019) ¶¶ 52–57, 65; *see also* Leland Decl., Ex. 31, Lockerbie Aff. ¶¶ 18, 21 (noting the role that the Witness Requirement played in the state's ability to detect and prosecute the Dowless scheme). Moreover, the Witness Requirement was pivotal to discovery and prosecution of the scheme. *See* Lockerbie Aff. ¶¶ 18, 21. Permitting the BOE's Numbered Memos to take effect and eliminate the witness requirement and ballot harvesting ban would leave North Carolina without the ability to enforce the very requirements that interfered with Dowless's plan, enabled the BOE to discover and investigate the scheme, and ultimately resulted in a new election with valid results.

The General Assembly enacted its absentee voting laws out of concern for these very issues, and the BOE cannot rely on a state interest to defend the constitutionality of its actions for that reason. When reviewing constitutional challenges to election laws under the Fourteenth Amendment, the *Anderson-Burdick* balancing test requires courts to weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests *put forward by the State* as justifications for the burden imposed by its rule . . ." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (internal quotation marks omitted and emphasis added). Here, the BOE is acting *against* the interests of the State. The General Assembly acted responsibly in responding to the COVID-19 pandemic. The BOE would now override the General Assembly's decision and implement policies the General Assembly considered but declined to adopt, while eliminating others that retained to preserve the integrity of the electoral process. Permitting the BOE to usurp the General

Assembly's authority would violate the fundamental right of North Carolinians to have their votes counted on an equal basis without dilution and undermine their confidence in a fair election.

### D. The Deal Creates Two Absentee Voting Regimes in Violation of the Equal Protection Clause to the U.S. Constitution.

If the State Board were to have its way, the nullification of the witness requirement, postage requirement, and ballot harvesting ban would come into effect weeks into the absentee voting process—resulting in the differential treatment of voters who submitted their ballots before and after the State Board's sought-after changes. Such an arbitrary system would violate the Equal Protection Clause's guarantee that "each qualified voter be given an equal opportunity to participate in that election." *Hadley v. Junior Coll. Dist.*, 397 U.S. 50, 56 (1968).

The Equal Protection Clause of the Fourteenth Amendment requires that North Carolina treat its voters equally to ensure that they are accorded their "right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336. Under the Fourteenth Amendment, the fundamental right to vote "is protected in more than the initial allocation of the franchise." *Bush*, 531 U.S. at 530. "[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 530.

The State Board's actions would violate this guarantee by creating a two-tiered absentee ballot voting process, according to which voters who submitted their ballots before the Numbered Memos' release were required to comply with North Carolina law while those voters who submit their ballots afterwards are not. Absentee voting in North Carolina has been well underway since September 4, *see* N.C. Gen. Stat. § 163-227.10(a). Already at least 239,705 absentee ballots,

including that of Plaintiff Patsy Wise, have been returned in compliance with the full range of requirements set forth in HB 1169. Leland Decl., Ex. 22, BOE Absentee Data. Now, weeks into absentee voting, the State Board has issued multiple Numbered Memos that would nullify certain absentee voting requirements entirely, penalizing absentee voters, like Ms. Wise, who have already submitted their ballots in compliance with those requirements. The State Board has offered no legitimate rationale for this policy change, which comes after the State Board has spent months successfully defending the importance of the very absentee voting provisions that it would now nullify. Such an arbitrary, two-tiered absentee voting system constitutes a clear violation of the Fourteenth Amendment's guarantee of equal protection.

## II. EQUITY WEIGHS IN FAVOR OF A TEMPORARY RESTRAINING ORDER

The Numbered Memos at issue are already posted on the BOE's website and are purportedly already in effect. A voter relying on the cure process can forego the witness requirement, expecting to cure that ballot defect by submitting an unwitnessed certification. Voters may rely on the Memos to entrust their ballots to unscrupulous ballot harvesters. As election day draws closer, the postmark and ballot receipt deadlines will become critical, and perhaps decisive in some of the elections. The situation is urgent. The changes will cause confusion among many voters, including the Republican Committees' members, and even among election administrators. This will create "incentiv[e]s to remain way from the polls." *Purcell*, 549 U.S. at 4-5. And as shown (p. 9 above), the changes will undermine investments previously made by the Republican Committees.

The remaining equities and public interest also weigh in Plaintiffs' favor. *First*, the General Assembly has already appropriately weighed concerns related to the pandemic and postal service, and its decision deserves deference. *Second*, as shown, the provisions the deal would override are directed at protecting the integrity of the election process. The public interest strongly

29

favors safeguarding "public confidence in the integrity of the electoral process." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 197 (2008). *Third*, the State has a compelling interest in promoting the "orderly administration" of elections through laws such as the postmark requirement and receipt deadline. *See id.* at 195. The equities weigh strongly in favor of injunctive relief.

## **CONCLUSION**

For these reasons, Plaintiffs respectfully urge this Court to grant their motion.

Respectfully submitted,

Dated: September 26, 2020

By: /s/ R. Scott Tobin
R. Scott Tobin, N.C. Bar No. 34317
Taylor English Duma LLP
4208 Six Forks Road, Suite 1000
Raleigh, North Carolina 27609
Telephone: (404) 640-5951
Email: stobin@taylorenglish.com

Bobby R. Burchfield (*pro hac vice pending*)
Matthew M. Leland (*pro hac vice pending*)
King & Spalding LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C. 20006
Telephone: (202) 626-5524
Email: bburchfield@kslaw.com
Email: mleland@kslaw.com

*Counsel for the Republican Committees*

30

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of September, 2020, I electronically filed the foregoing document using the court's CM/ECF system and that I have electronically mailed the documents to all non-CM/ECF participants.

/s/ *R. Scott Tobin*
R. Scott Tobin