UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

Civil Action No. 5:20-cv-00505

| | |
|---|---|
| PATSY J. WISE, REGIS CLIFFORD, CAMILLE ANNETTE BAMBINI, SAMUEL GRAYSON BAUM, DONALD J. TRUMP FOR PRESIDENT INC., U.S. CONGRESSMAN DANIEL BISHOP, U.S. CONGRESSMAN GREGORY F. MURPHY, REPUBLICAN NATIONAL COMMITTEE, NATIONAL REPUBLICAN SENATORIAL COMMITTEE, NATIONAL REPUBLICAN CONGRESSIONAL COMMITTEE, and NORTH CAROLINA REPUBLICAN PARTY,, <br><br> Plaintiffs, <br> v. <br><br> THE NORTH CAROLINA STATE BOARD OF ELECTIONS; DAMON CIRCOSTA, in his official capacity as CHAIR OF THE STATE BOARD OF ELECTIONS; STELLA ANDERSON, in her official capacity as SECRETARY OF THE STATE BOARD OF ELECTIONS; JEFF CARMON III, in his official capacity as MEMBER OF THE STATE BOARD OF ELECTIONS; KAREN BRINSON BELL, in her official capacity as EXECUTIVE DIRECTOR OF THE STATE BOARD OF ELECTIONS, <br><br> Defendants. | **MEMORANUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE** |

**NOW COME** defendants and, in support of their motion to transfer venue to the United States District Court for the Middle District of North Carolina, show the Court the following:

## NATURE OF THE CASE

Plaintiffs have brought this action claiming violation of the Elections Clause (U.S. CONST. art. I, § 4, cl. 1), the provision of the Constitution the selection of presidential electors (U.S. Const. art II, § 1) and the Equal Protection Clause (U.S. CONST. amend, XIV, § 1) of the United States Constitution. Citing recent guidance issued by the North Carolina State Board of Elections ("the State Board") and a consent order proposed in parallel state court litigation, *N.C. Alliance for Retired Americans v. The North Carolina State Board of Elections*, Wake County Superior Court 20-CVS-8881 (filed August 10, 2020), they assert that the State Board has "usurped" authority belonging to the North Carolina General Assembly. In addition, they claim that the guidance issued by the State Board and the potential consent order violate the equal protection rights of North Carolina voters who have already voted by mail-in absentee ballot in the 2020 general election.

Plaintiffs' claims are both factually and legally baseless and are subject to numerous procedural bars. They ignore the statutory authority—authority conferred on the State Board by the General Assembly—pursuant to which all relevant actions of the State Board have been taken. They seek to embroil this Court in questions of North Carolina law that are already presented in a state court proceeding to which two of the plaintiffs are parties. And they ask this Court to take up issues in this case that have already been addressed by the Hon. William L. Osteen, Jr., in a preliminary injunction order entered in a case pending in the United States District Court for the Middle District of North Carolina. *See Democracy North Carolina v. NC State Board of Elections*, 2020 U.S. Dist. LEXIS 138492 (Aug. 4, 2020). In short, plaintiffs come to this Court in hopes of an end-run around both Judge Osteen's ruling and any action that might be taken in North

Carolina's state courts.[1]

This Court need not be drawn into plaintiffs' transparent attempt at forum-shopping, which undermined judicial economy. This Court should transfer this matter, pursuant to both 28 U.S.C. § 1404(a) and to the "first-filed rule," to the Middle District of North Carolina so that Judge Osteen can consider the claims presented here in tandem with those already before him in *Democracy NC* and, at least in terms of a preliminary injunction, already decided by him in that case.

## STATEMENT OF THE FACTS

### A. COVID-19 and the State's Response to the Global Pandemic

The effects of the novel coronavirus strain known as COVID-19, both on public health and on a wide variety of activities are, by now, well-known. The COVID-19 pandemic has been widely recognized as the greatest global health crisis in at least a century. In our State alone, at least 207,380 people have had laboratory-confirmed cases of COVID-19 and at least 3,441 have died from the virus.[2] The COVID-19 pandemic is the greatest threat to global health in the last century.[3] It has affected the way we work, the way we interact with each other, and it has affected the way we vote.

Recognizing this, on March 15, 2020, State Board Executive Director Bell issued Numbered Memo 2020-11 to North Carolina's 100 county boards of elections to update them on the State Board's responses to the COVID-19 outbreak, provide recommendations that the county

---

[1] Notably, a number of the plaintiffs in this case have leave to participate as *amici* in *Democracy NC*. Similarly, two of the plaintiffs in a parallel action filed on the same day as this action and raising claims almost identical to those asserted here, *Moore v. Circosta*, E.D.N.C. 4:20-cv-00182 (filed Sept. 26, 2020), are also parties to both the *NC Alliance* case and the *Democracy NC* case.
[2] https://covid19.ncdhhs.gov/, accessed Sept. 27, 2020.
[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7175860/, accessed Sept. 27, 2020.

boards conduct meetings electronically, and adjust certain deadlines following the March 3, 2020, primary.[4]

On March 26, 2020, Bell issued a letter of recommendation to the North Carolina General Assembly and the Governor to address the issues raised by COVID-19.[5] The recommendations included allowing absentee requests to be submitted by fax or email, establishment of an online portal for absentee requests, permitting postage to be pre-paid for absentee ballots, and reducing or eliminating the witness requirement for elections conducted in 2020. *Id.* Bell also recommended temporarily modifying the prohibition on employees of hospitals, nursing homes, and other congregate living facilities to allow these individuals to assist voters and serve as witnesses in light of current visitor restrictions. *Id.* Additionally, Bell recommended that county boards of elections be allowed flexibility to determine their sites and hours for early voting to allow a tailored response to COVID-19 pandemic in each county. *Id.*

On March 20, 2020, pursuant to her statutory emergency authority, Bell issued an order rescheduling the Republican second primary in Congressional District 11 from May 12 to June 23.[6] This order also modified some reporting deadlines and suspended certain logging requirements to allow county board offices to work while being physically closed. *Id.* Finally, the order allowed transfer of certain voters to non-adjacent precincts if the transfer was related to the COVID-19 pandemic. *Id.*

---

[4] https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2020/Numbered%20-Memo%202020-11_Coronavirus%20Response.pdf, accessed Sept. 27, 2020.
[5] https://s3.amazonaws.com/dl.ncsbe.gov/sboe/SBE%20Legislative%20Recommend-ations_COVID-19.pdf, accessed Sept. 27, 2020.
[6] https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/Orders/-Executive%20Director%20Orders/Order_2020-03-20%20.pdf, accessed Sept. 27, 2020.

4

On June 1, 2020, Bell issued Numbered Memo 2020-12, in which she provided guidance for counties administering the June 23 primary.[7] *Id.*, ¶ 10. In particular, Bell established policies to provide a safe experience for voters and elections officials during the COVID-19 pandemic, including requiring poll workers and other staff to wear personal protective equipment, including masks, face protection, and gloves and, when appropriate, to self-screen for symptoms before reporting to work. *Id.* Voters were provided with masks if they needed one, hand sanitizer, and single-use ballot-marking devices. *Id.* Bell also ordered routine cleanings and social-distancing measures, consistent with CDC guidelines. *Id.*

On June 10, 2020, the North Carolina General Assembly enacted House Bill 1169, which the Governor signed into law as North Carolina Session Law 2020-17 the following day. This law made a number of changes in response to the COVID-19 pandemic. For example, it reduced the requirement of having two witnesses for absentee ballots to one witness. 2020 N.C. SESS. LAWS 17, § 1.(a). In addition, it gave county boards of elections greater flexibility to allow non-resident precinct officials to serve, which will help ensure that each polling places remains open even if some current precinct officials are unable or decline to serve. 2020 N.C. SESS. LAWS 17, § 1.(b). Session Law 2020-17 also made provisions for multipartisan assistance teams to assist any voter in the state, including those in nursing homes, to fill out their ballots and requests. 2020 N.C. SESS. LAWS 17, §§ 1.(c), 2.(b). Additionally, Session Law 2020-17 also provided for absentee ballot request forms to be made online through an electronic portal that will be made available on September 1. 2020 N.C. SESS. LAWS 17, § 7.(a). Finally, Session Law 2020-17 provided matching

---

[7] https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2020/Numbered%-20Memo%202020-12_In-Person%20COVID%20Response%20June%2023%20Election.pdf, accessed Sept. 27, 2020.

5

funds for the federal CARES Act (P.L. 116-136), allowing county boards to take advantage of federal funding to assist them in preparing for the elections in light of the COVID-19 pandemic.

Simultaneously, on June 19, 2020, the State Board announced that it was engaging in an aggressive campaign to recruit people to serve as election officials at early voting sites and on Election Day.[8] This effort is part of a broader plan to recruit additional poll workers to serve in 2020.

And finally, on July 17, 2020, Bell issued an emergency order, requiring county boards of elections to have a minimum of 10 hours of voting each of the first two weekends of early voting, to have at least one polling site open during the early-voting period for every 20,000 registered voters, and to require frequent sanitization and use of PPE in accordance with CDC guidelines.[9] This order was intended to ensure that there were sufficient sites and sufficient quality hours for voters to be able to exercise their right to vote safely.

On July 30, 2020, Thomas J. Marshall, General Counsel and Executive Vice President of the United States Postal Service sent a letter to North Carolina's Secretary of State stating that "under our reading of North Carolina's election laws, certain deadlines for requesting and casting mail-in ballots are incongruous with the Postal Service's delivery standards." (Ex. 1)

    **B.**    **The M.D.N.C. Action:** *Democracy NC v. The North Carolina State Board of Elections*

On May 22, 2020, the groups Democracy North Carolina and the League of Women Voters of North Carolina, together with a number of individual voters, filed an action in the United States

---

[8] https://www.ncsbe.gov/news/press-releases/2020/06/19/election-officials-searching-democracy-heroes-launch-new-portal, accessed Sept. 27, 2020.
[9] https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2020/Numbered%-20Memo%202020-14_Emergency%20Order%20of%20July%2017%2C%202020.pdf, accessed Sept, 27, 2020.

District Court for the Middle District of North Carolina. *See Democracy North Carolina v. NC State Board of Elections*, 2020 U.S. Dist. LEXIS 138492 (Aug. 4, 2020). In that action, the plaintiffs challenged various provisions of North Carolina election law, alleging that in the context of the COVID-19 pandemic, those election law provisions infringe on their rights under the United States Constitution and federal statutes. Among the provisions of North Carolina law challenged in *Democracy NC* are the witness requirement for mail-in absentee ballots, the restrictions on how absentee ballots can be returned to county boards of elections. The *Democracy NC* plaintiffs also sought imposition of procedures for curing deficiencies in returned absentee ballots. The plaintiffs filed their First Amended Complaint and their Motion for Preliminary Injunction on June 5, 2020. On June 18, they filed their Second Amended Complaint to reflect the changes in election law for the 2020 general election enacted by 2020 N.C. SESS. LAWS 17.

On August 4, 2020, following a two-day evidentiary hearing and a third day of oral argument, the court entered its ruling on the plaintiffs' preliminary injunction motion. *Democracy NC*, 2020 U.S. Dist. LEXIS 138492 (Aug. 4, 2020). In its 188–page opinion and order, the court denied the request for preliminary injunction except as to two matters. First, the court enjoined the defendants from enforcing those provisions of law that prohibit employees of nursing care facilities from assisting voters with their absentee ballot as to one of the individual plaintiffs who is blind and who is in a nursing facility where no one but residents and employees are allowed. *Id*. at *182–83. And second, the court enjoined defendants "from the disallowance or rejection, or permitting the disallowance or rejection, of absentee ballots without due process as to those ballots with a material error that is subject to remediation," and directed the adoption of procedures "which provide[] a voter with notice and an opportunity to be heard before an absentee ballot with a material error subject to remediation is disallowed or rejected." *Id*. at *182. Though the court

7

denied much of the injunctive relief sought by the plaintiffs, it noted that "Plaintiffs have raised genuine issues of concern with respect to the November General Election. Should Legislative and Executive Defendants believe these issues may now be discounted or disregarded for purposes of the impending election, they would be sorely mistaken." *Id*. at *4. This opinion and order was not appealed by any party, including Moore and Berger.

In response to the court's directive to adopt of cure procedures, the State Board issued Numbered Memo 2020-19 on August 21, 2020 [D.E. 1-3]; this numbered memo was revised and updated on September 22, 2020.[10]

### C. The State Court Action: *North Carolina Alliance for Retired Americans v. The North Carolina State Board of Elections*

On August 10, 2020, the North Carolina Alliance for Retired Americans, together with a number of individual voters, filed an action in Wake County Superior Court. On August 18, 2020, the plaintiffs filed their Amended Complaint. [D.E. 1- 9] In that action, the plaintiffs challenge limitations on the number or hours and days that counties can offer one-stop in-person absentee voting ("early voting"); the witness requirement for mail-in absentee ballots; North Carolina's decision not to provide pre-paid postage for mail-in absentee ballot return envelopes; rejection of mail-in absentee ballots that are postmarked by Election Day but delivered to county boards more than three days after the election, given concerns over delivery delays and operational difficulties with the United States Postal Service; rejection of absentee mail-in ballots due when the voters signature does not match the signature on file with a board of elections; and restrictions on assistance with requesting a returning mail-in absentee ballots. *Id*. Also on August 18, 2020, the plaintiffs filed their Motion for Preliminary Injunction.

---

[10] https://s3.amazonaws.com/dl.ncsbe.gov/sboe/numbermemo/2020/Numbered%20Memo%-202020-19_Absentee%20Deficiencies.pdf, accessed Sept. 27, 2020.

On August 12, 2020, the Republican National Committee ("RNC"), the National Republican Senatorial Committee ("NRSC"), the National Republican Congressional Committee ("NRCC"), Donald J. Trump for President, Inc. ("DJT"), and the North Carolina Republican Party ("NCRP") (collectively "the Political Committees")—all of whom are plaintiffs in this action—moved to intervene, both as of right and permissively, in the *NC Alliance* action. The court notified the parties on September 24, 2020, that the motion for permissive intervention is allowed, although a signed order has not yet been filed.

On September 22, 2020, the *NC Alliance* plaintiffs and the Executive (State Board) defendants filed a Joint Motion for Entry of a Consent Judgment with the superior court. [D.E. 1-1] By that joint motion, the *NC Alliance* plaintiffs and the Executive Defendants consent to entry of an order by the Superior Court of Wake County. Under the proposed consent order, plaintiffs agreed to drop many of their demands, including expanded early voting, elimination of the witness requirement for mail-in absentee ballots, and pre-paid postage for mail-in absentee ballot return envelopes. The Executive Defendants agreed to extend the deadline for receipt of mail-in absentee ballots mailed on or before Election Day to nine (9) days after Election Day to match the UOCAVA deadline, and in keeping with the guidance received on July 30, 2020 from the Postal Service; implement, implement the cure process set forth in Numbered Memo 2020-19, as revised; and establish separate mail-in absentee ballot "drop off stations" staffed by county board officials at each early voting site and at each county board of elections. Plaintiffs agreed to accept these measures "as a full and final resolution of Plaintiffs' claims against Executive Defendants related to the conduct of the 2020 elections." A hearing on the joint motion is set for this coming Friday, October 2, 2020, in the Superior Court of Wake County.

# ARGUMENT

## I. The Court Should Transfer This Matter the Middle District Pursuant to Section 1404 (a).

Under 28 U.S.C.S. § 1404(a), this Court has the discretion to transfer this action to the Middle District of North Carolina. This Court should do so because it would be more convenient for the parties and serve the interests of justice to have these issues resolved before the District Court that is already presiding over a case involving closely related matters, considering many of the same issues, and in which the defendants are parties and the Political Committees, which moved to intervene, have been allowed to participate as *amici*.

Section 1404(a) provides "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C.S. § 1404(a). This section "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'" *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)) The purpose of the statute is to "prevent the waste of time, energy, and money, and to protect litigants, witnesses, and the public against unnecessary inconvenience and expense." *Van Dusen*, 376 U.S. at 616.

The statute requires that that the other district must be a district where the matter might have been brought by the plaintiff. In order to meet this threshold requirement, the Middle District must be a district in which the Plaintiffs had the right to bring the action against the Defendants. *Hoffman v. Blaski*, 363 U.S. 335, 80 S. Ct. 1084, 4 L. Ed. 2d 1254 (1960). Here, the Defendants are all state officials sued in their official capacities, and representing a state agency with state-wide authority to administer elections. They are currently proper parties in the Middle District in

10

the related *Democracy NC* action. The Political Committees, who are plaintiffs in this action, sought to intervene in *Democracy NC*, and while that motion was denied, they have been permitted to argue as *amici*.

Within the Fourth Circuit, district courts determining whether to transfer venue consider: "(1) the weight according to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interests of justice." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs.*, 791 F.3d 436, 444 (4th Cir. 2015). In balancing these factors, a district court has substantial discretion to decide whether to transfer venue. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).

### A. Plaintiffs' Choice of Venue.

While the general rule is that the plaintiff's choice of venue is to be given substantial weight in determining transfer (*Plumbing Servs.*, 791 F.3d at 444), in this particular case it should not be afforded such weight because plaintiffs are attempting to shed their status as *amici*, who could seek reconsideration of their motion to intervene in order to avoid a forum where the court has already ruled, at least in part, against the position they have advocated as *amici*. If plaintiffs' choice of this venue for this matter is given substantial weight in this determination, it is the equivalent of ignoring the choice made by plaintiffs in *Democracy NC* when they selected the Middle District. Thus, under these circumstance, this Court should give no weight to plaintiffs' choice.

### B. Convenience and Access to Witnesses.

Second, at this stage in the litigation, it is unclear what witnesses, if any, would be necessary to the proceedings beyond the parties themselves. To the extent that state officials will be witnesses in this matter, they are not yet identified, but their ability to appear in the Middle

11

District is not significantly more onerous than their ability to appear in the Eastern District. Indeed, many of the same witnesses required to appear in *Democracy NC* would likely also be necessary for this action, as the issues and evidence are closely related. As those witnesses already appeared in the Middle District, there can be no argument that they would be unwilling or unable to appear in the Middle District, and it would likely enhance their inconvenience if they were required to appear in a second district. Therefore, this factor favors transfer to the more appropriate venue in the Middle District.

### C. Convenience of the Parties.

Third, with respect to the convenience of the parties, they would be inconvenienced by having to relitigate the same issues in a different district when they are already parties in related litigation in the Middle District. It would be inconvenient to defendants to respond to claims in both actions, respond to discovery in both actions, and potentially be forced to comply with conflicting orders from two different courts on the same issue.

Moreover, the individual plaintiffs would not be inconvenienced by transfer to the Middle District. The Political Committees are groups with statewide, if not national, coverage and mission. These plaintiffs allege no specific allegations as to why the Eastern District would be more convenient or why they would be inconvenienced by having these issues resolved by the Middle District.

### D. The Interests of Justice.

Fourth, the interests of justice and judicial economy argue strongly in favor of transferring this matter to the Middle District. The interests of justice encompass the "public-interest factors of systemic integrity and fairness." *Stewart Org., Inc.*, 487 U.S. at 30. "The interests of justice implicate the relative congestion of the transferee and transferor courts, the particular

12

Case 5:20-cv-00505-D Document 7 Filed 09/28/20 Page 12 of 18

interest a forum may have in deciding a case, and the preference for judicial efficiency and consistency." *Cherry Tree Farms, LLC v. Runyan*, No. 2:16-CV-60-D, 2016 U.S. Dist. LEXIS 176501, at *11 (E.D.N.C. Dec. 21, 2016). As to congestion, it does not appear it would be determinative to this analysis. The remaining considerations of systemic integrity, fairness, the particular interest of the other forum, consistency, and judicial economy, all argue strongly in favor of a transfer to the Middle District.

The issues presented in this case substantially overlap with those presented and already considered, at least for the purposes of preliminary injunctive relief, in *Democracy NC*. This is especially so as to the cure procedures set forth in Numbered Memo 2020-19. The cure procedures that plaintiffs challenge here are the very ones that the State Board put in place in order to comply with Judge Osteen's preliminary injunction order. It is not in the interests of justice, economy, or convenience to have one federal court relitigate issues arising directly under an order issued by another federal court, especially while that earlier case is ongoing. Indeed, such relitigation and the possibility of divergent decisions presents the very real possibility that the relief sought by plaintiffs in this Court could place defendants in the position of failing to comply with the orders of another federal court, or even put defendants at risk of contempt in that other federal court.

Nor are interests of judicial economy and efficiency limited to the cure procedures set forth in Numbered Memo 2020-19. Judge Osteen, for example, is also already presented in *Democracy NC* with questions concerning delivery of mail-in absentee ballots in a safe and secure manner— questions squarely implicated by the "drop-off stations" to be staffed by county board officials contemplated by the Joint Motion for a Consent Order challenged by plaintiffs in this action. Simply put, plaintiffs here seek to have this Court consider and relitigate issues already pending

in the Middle District of North Carolina. Under those circumstances, transfer of venue to the Middle District is not only appropriate, it is strongly warranted.

### II. This Court Should Transfer This Action to the Middle District of North Carolina Under the First-Filed Rule.

The Fourth Circuit "has [] recognized the 'first-filed' rule, which provides a presumption of priority in parallel litigation in the venue where jurisdiction is first established." *Golden Corral Franchising Sys. v. GC of Vineland, LLC*, 2020 U.S. Dist. LEXIS 45887, *4 (E.D.N.C. Mar. 17, 2020) (internal citation omitted). Under the "first-filed rule," "where similar law suits have been filed in multiple federal forums, the first-filed suit usually should have priority, 'absent the showing of balance of convenience in favor of the second action.'" *Berger v. United States DOJ*, 2016 U.S. Dist. LEXIS 84536, *30 (E.D.N.C. June 29, 2016) (quoting *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594-95 (4th Cir. 2004)). "To determine whether a case is the 'first filed' the court looks to 1) the chronology of the filings, 2) the similarity of the parties, and 3) the similarity of the issues at stake." *Id*.

Notably, the first-filed rule can also apply when the prior case is in state, not federal court, and permitting the federal action to go forward would result in unnecessary entanglement between the federal and state court systems. "The risk of such entanglement is especially acute where the same issues being litigated in federal court 'are already being litigated by the same parties in the related state court action[ ],' since any factual determinations first made in one proceeding would likely have preclusive effect in the other, thus 'frustrat[ing] the orderly progress of [the other] proceeding[ ] by leaving the . . . court with some parts of [the] case foreclosed from further examination but still other parts in need of full scale resolution.'" *VRCompliance LLC v.*

14

*Homeaway, Inc.*, 715 F.3d 570, 574-575 (4th Cir. 2013) (quoting *Nautilus Ins. Co. v. Winchester Homes, Inc.*, 15 F.3d 371, 379, 377 (4th Cir. 1994)) (internal quotation marks omitted).

Here, there is no question that *Democracy NC* was filed in the United States District Court for the Middle District of North Carolina first, having been filed over four months before the commencement of this action and having proceeded through thorough consideration of preliminary injunctive relief. Likewise, it is clear that *NC Alliance* was filed in the Superior Court of Wake County over approximately one and one-half months prior to the filing of this case. Thus, the chronology of the filings clearly establish that the first prong of the first-filed rule inquiry is satisfied. Likewise, there is unquestionably similarity of parties. Except for plaintiffs Wise, Clifford, Bambini, Baum, Bishop and Murphy, all of the parties to this action are either parties or *amici* in *Democracy NC* and parties in *NC Alliance*.[11]

The remaining consideration is whether there are similar issues at stake. The issues do not have to be identical. *See Berger*, 2016 U.S. Dist. LEXIS at *31-21 (finding that similar issues are at stake when the issues presented in the different cases "bear on a common question"). Here, there is no question that the claims asserted in this action "bear on common questions" with *Democracy NC* and with *NC Alliance*. For example, plaintiffs here are essentially seeking to undo the cure procedures that have been put in place to comply with the Judge Osteen's preliminary injunction order. The place to do that is in *Democracy NC*, in the Middle District, not a separate case in a different judicial district. Likewise, plaintiffs are asking this Court to examine issues concerning safe and secure delivery, by means other than mail, of absentee ballots—issues that are

---

[11] That all of the members of the State Board named as defendants in this action are not named as defendants in the other actions is a distinction without a difference. All of those members are named here in their official capacities, and the State Board is named as a defendant in the other actions; it is the State Board that is the party in interest in all three actions.

15

raised in *Democracy NC* and have already been considered at the preliminary injunction stage by Judge Osteen.

Indeed, it is difficult to see this action as anything but an attempt to have a federal court—though notably *not* the federal court that has already entered preliminary injunctive relief with regard to cure procedures for defective absentee ballots, which are also at issue here—preempt action by a state court on a motion currently pending before that court. There is no reason that plaintiffs in this action cannot raise the same concerns and arguments they present in this case in the state court hearing on the Joint Motion for a Consent Order in *NC Alliance* currently scheduled for Friday, October 2. The Political Committees have been allowed to intervene in *NC Alliance*, and have clearly indicated their intent to participate in that hearing. Nor is there any reason that the Political Committees cannot renew their motion to intervene in *Democracy NC*, and seek to present their claims to Judge Osteen.

Rather than avail themselves of these available options, however, they seek to bring yet another court, and a second federal court, into this dispute. This sort of forum shopping is precisely what the first-filed rule is designed to prevent. Transferring this action to the Middle District of North Carolina will serve the interests of judicial economy and efficiency, as well as the interests of consistent legal rulings. Not transferring the case, on the other hand, risks fragmented and conflicting rulings, as well as the unnecessary and completely avoidable entanglement of state and federal courts. This Court should reject plaintiffs' attempts to side-step the proceedings in other courts and should, under the first-filed rule, transfer this action to the Middle District.

## **CONCLUSION**

For the foregoing reason, this case should be transferred to the United States District Court for the Middle District of North Carolina.

This the 28th day of September, 2020.

                              JOSHUA H. STEIN
                              Attorney General

                              /s/ Alexander McC. Peters
                              Alexander McC. Peters
                              N.C. State Bar No. 13654
                              Chief Deputy Attorney General
                              N.C. Dept. of Justice
                              Post Office Box 629
                              Raleigh, NC 27602
                              Telephone: (919) 716-6900
                              Facsimile: (919) 716-6763
                              Email: apeters@ncdoj.gov

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.2(f)(4), the undersigned counsel hereby certifies that the foregoing Memorandum, including body, headings, and footnotes, contains 4,711 words as measured by Microsoft Word.

Respectfully submitted this the 28th day of September, 2020.

/s/ Alexander McC. Peters
Alexander McC. Peters
Chief Deputy Attorney General